# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

Colin Cahill,                              )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )        Case No. 07-CV-03432-NKL
                                           )
Michael J. Astrue,                         )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )

## ORDER

Plaintiff Colin Cahill ("Cahill") challenges the Social Security Commissioner's ("Commissioner") denial of his claim of disability and disability insurance benefits. This suit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433.

Cahill's initial application was denied, and he appealed the denial to an administrative law judge ("ALJ"). After an administrative hearing, the ALJ found that Cahill was not "disabled" as that term is defined in the Act. The Appeals Council denied Cahill's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The Court remands the matter to the ALJ for further proceedings in accordance with this Order.

1

## I.    Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]  At the time of the hearing, Cahill was a forty-nine-year-old high school graduate.  He worked as a welder and as a drywall applicator before his alleged disability.  Cahill alleged he became disabled on or about August 5, 2003.

Cahill's medical records are extensive.  In May 2002, x-rays indicated that he had degenerative arthritis in his neck.  In June 2002, he sought treatment for foot pain and ankle swelling.

In August 2002, Cahill sought treatment for his neck pain from Roger Whaley, D.C., a chiropractor.  Cahill was involved in motor vehicle accident in September 2002.  Dr. Whaley also treated Cahill for injuries sustained in the accident. Cahill's complaints included neck, shoulder and arm pain that caused difficulty in sleeping, stiffness and numbness.

In a November 2002 letter to Cahill's insurer, Dr. Whaley reported that Cahill was recovering slowly and may have a cervical disc problem; Dr. Whaley recommended a neurological examination for a possible disc lesion.  A January 2003 MRI demonstrated mild to moderate osteoarthritis.

Dr. Whaley continued to care for Cahill, using less conservative forms of

---

[1]  Portions of the parties' briefs are adopted without quotation designated.

2

chiropractic therapy than he had previously. In January 2003, Dr. Whaley noted that Cahill had to use his left hand to close his right hand if he wanted to hold a wrench. In February 2002, Dr. Whaley noted that Cahill's symptoms were exacerbated by the weather and continued to cause difficulty sleeping. Dr. Whaley treated Cahill from March 2003 through July 2003, seeing him no less than fourteen times without relief.

On August 5, 2003, the date Cahill alleges disability, Cahill went to the emergency room ("ER") with pain and swelling in his right leg. He was diagnosed with cellulitis and prescribed an antibiotic. At a follow-up visit, there was a significant decrease in swelling.

In late-August 2003, Cahill presented to Dr. Whaley with swelling and numbness in his right hand and lower extremities. Cahill reported that he had been unable to get out of bed for the past few weeks. Dr. Whaley noted that Cahill had been working less as a result of the numbness in his hand; Dr. Whaley's records state that Cahill's condition was most likely aggravated by his work.

Cahill continued to experience swelling in his right leg in September and October 2003. He sought treatment from medical doctors on several occasions during that time, and was diagnosed with cellulitis.[2]

Dr. Whaley noted Cahill was still working in October 2003, at which time he was still experiencing weakness and decreased sensation/gripping ability in his hand upon

_____

[2] Cellulitis is "[a]n acute, diffuse, spreading, edematous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle, sometimes with abscess formation." *Dorland's Illustrated Medical Dictionary* 317 (29th ed. 2000).

3

examination. Dr. Whaley's notes show that Cahill cancelled an appointment to go deer hunting in November 2003.

Cahill was in another motor vehicle accident in December 2003.

In January and February 2004, Cahill sought medical care for neck pain. The treating doctor reported that Cahill had tenderness, a limited range of motion in his cervical spine, a limited flexion and extension of about fifty percent, and a limited reach-around ability with his fourth and fifth fingers. Cahill asked his treating doctor for a referral to a neurologist to evaluate the pain and numbness in his right arm and hand. Cahill mentioned that he had two lawsuits pending from the car accidents and that his lawyer and Dr. Whaley wanted him to see a neurologist.

In April 2004, Cahill reported to neurologist Alok Pasricha, M.D., who diagnosed Cahill with mild degenerative joint disease of the cervical spine and possible degenerative joint disease of the lumbosacral spine, with excessive muscle soreness and fatigue. Cahill reported it was becoming more difficult for him to work. Dr. Pasricha noted no sensory loss or loss of strength, with normal gait and coordination.

An April 2004 electromyography exam suggested muscle irritation and inflammation. Dr. Pasricha's report states that Cahill still complained of neck stiffness, exacerbated by cold and physical activity, which caused difficulty sleeping. At a May 2004 follow-up visit to Dr. Pasricha, Cahill reported some improvement, but ongoing numbness and muscle spasms, mostly at night and with physical movement. Considering some abnormal laboratory tests, Dr. Pasricha believed the most likely diagnosis was

4

myotonia congenita (Thomsen's disease),[3] and recommended additional testing.

In August 2004, Cahill was examined by Dr. Glenn Lopate, of the Neuromuscular Division at Washington University School of Medicine. Dr. Lopate noted decreased vibratory and pin-prick sensation, but stated that strength and light-touch sensation were normal or good. Dr. Lopate found no signs of myotonia. He recommended a muscle biopsy. The muscle biopsy showed some abnormal results, including "mild acute denervation" with some hypertrophy.

When Dr. Lopate examined Cahill in October 2004, he found Cahill alert and oriented, but noted that he was agitated and lost focus during the exam. Cahill reported extreme fatigue and weakness, causing Cahill to sleep up to six days at a time. Sensory exam showed patchy pin-prick sensation and vibratory testing showed numbness and loss of sensation in both of Cahill's toes and ankles. Dr. Lopate believed a glycogen storage disorder could explain Cahill's fatigue and abnormal laboratory tests, but not his numbness.

In November 2004, Cahill returned to Dr. Pasricha, who diagnosed possible myopathy or glycogen storage disease. Cahill continued to report muscle cramps and fatigue in his arms and legs. In that same month, Dr. Pasricha wrote a letter stating that Cahill suffered from symptoms of myopathy, a debilitating disease of the muscular tissue

---

[3]     Myotonia congenita is a "congenital genetic disease characterized by tonic spasm and rigidity of certain muscles when an attempt is made to move them after a period of rest or when mechanically stimulated. The stiffness disappears as the muscles are used." *Dorland's Illustrated Medical Dictionary* 1093 (27th ed. 1988).

5

that causes muscle weakness, spasms and pain; Dr. Pasricha wrote that the symptoms were expected to continue for an indefinite period of time and at least for the next three years.[4]

In January 2005, Dr. Pasricha indicated that Cahill had excessive fatigue and hypersomnolence secondary to anxiety and depression superimposed upon his organic disease. Dr. Pasricha prescribed an anti-depressant for anxiety.

A February 2005 letter from Dr. Lopate to Dr. Pasricha states that Cahill may have a glycogen storage disorder, though his presentation was not typical; Dr. Lopate found myotonia congenita unlikely. Dr. Lopate wrote that Cahill had normal strength, gait, coordination, reflexes and sensation. Dr. Lopate noted Cahill's continuing complaints of neck pain, arm pain, and foot pain, as well as excessive sleeping.

In March 2005, Dr. Pasricha diagnosed Cahill with bilateral carpal tunnel syndrome after noting that his reflexes were diminished. Cahill continued to complain of leg pain and numbness, which bothered him mostly at night. Dr. Pasricha reiterated the diagnosis of possible glycogen storage disease, noting that the muscle biopsy indicated such a disease, but that the biopsy did not obtain enough of a sample to test conclusively.

Cahill began physical therapy to try to relieve his symptoms. The therapist noted that Cahill demonstrated a forward head posture with a swayback posture, and opined that he had poor potential for rehabilitation. She noted limitations in range of motion and

---

[4] This letter appears to be related to an attempt by Cahill to refinance his home.

6

flexibility through his hips and lower back. Cahill completed eleven visits for physical therapy. The therapist consistently noted bilateral edema – swelling – and numbness in Cahill's feet and ankles with no change in symptoms. The therapists' notes show Cahill discharged for cancelled appointments. Cahill reported to Dr. Pasricha in October 2005 that he stopped attending physical therapy because he could not drive the long distance to the physical therapy center.

In April 2005, Disability Determinations Service physician Rana Mauldin, M.D., completed a residual functional capacity ("RFC") checkbox assessment of Cahill. Dr. Mauldin's assessment states that Cahill's treating physician's medical source statements were not available. Dr. Mauldin concluded that Cahill showed signs of degenerative disk and joint diseases as well as neuroforaminal stenosis, and that his history indicated neuropathy. Dr. Mauldin opined that Cahill could: sit six to eight hours in an eight-hour workday; stand and/or walk six hours in an eight-hour workday; lift and carry twenty pounds occasionally and ten pounds frequently; occasionally climb, kneel, crouch, crawl and frequently balance and stoop. Dr. Mauldin's assessment states that Cahill should avoid concentrated exposure to cold and vibration and hazards such as machinery and heights. Dr. Mauldin noted that Cahill was limited in his ability to push and/or pull in his upper extremities. It appears that Dr. Mauldin did not examine Cahill: the ALJ's decision refers to Dr. Mauldin as a "reviewing" physician, and Dr. Mauldin's RFC assessment form indicates that it is based on a review of Cahill's medical files.

Also in April 2005, Cahill had carpal tunnel surgery. In May 2005, Dr. Pasricha

noted that Cahill continued to have bilateral leg swelling/edema on examination.

Later that month, Cahill saw Dr. Randy Bowles, who diagnosed Cahill with glycogen storage disorder, Raynaud's disease,[5] possible Charcot-Marie-Tooth disorder,[6] and anxiety. Dr. Bowles noted a limp and Cahill's complaints of swelling and fatigue. Cahill returned to Dr. Bowles two additional times in June 2005; Dr. Bowles reported edema and included similar findings as those in his first report.

In June 2005, Cahill underwent a sleep study. He was diagnosed with sleep apnea and prescribed a device to help with sleeping. At the end of treatment in August 2005, the physician treating Cahill for sleep issues indicated that his sleep patterns had improved, but that he was still napping due to fatigue.

In July 2005, Dr. Pasricha noted diminished reflexes. Dr. Pasricha again indicated that Cahill most likely had a mild form of metabolic myopathy, such as glycogen storage disease, with possible degenerative arthritis of the cervical spine and radiculopathy. Later that month, an MRI revealed disc bulges in two places, with arthritis and degenerative changes to Cahill's joints.

An August 2005 report from Dr. Bowles shows Cahill essentially unchanged from

---

[5] Raynaud's phenomenon is characterized by "intermittent bilateral attacks of ischemia of the fingers or toes and sometimes of the ears or nose, marked by severe pallor, and often accompanied by paresthesia and pain; it is brought on characteristically by cold or emotional stimuli and relieved by heat, and is due to an underlying disease or anatomical abnormality. When the condition is idiopathic or primary it is termed Raynaud's disease." *Dorland's Illustrated Medical Dictionary* 1276 (27th ed. 1988).

[6] Charcot-Marie-Tooth disease, also known as peroneal muscular atrophy, is a neuromuscular disorder involving wasting of the more distal extremities with the legs usually afflicted before the arms. *Stedman's Medical Dictionary* 166 (26th ed. 1995).

8

Bowles' prior exam, with worsened swelling.

In October 2005, Cahill reported to a pain management clinic. The physician there noted the bulges on Cahill's MRI and diagnosed Cahill with Charcot-Marie-Tooth peripheral neuropathy and cervical spondylosis. The physician found no interventions were indicated for pain.

Later that month, Cahill saw Dr. Pasricha, whose diagnosis again included possible metabolic myopathy, as well as carpal tunnel syndrome, degenerative arthritis, and right meralgia paresthetica.[7] Dr. Pasricha again noted Cahill's complaints of numbness, neck pain, and swelling.

Also in October 2005, Cahill saw Dr. Bowles. Dr. Bowles' report shows Cahill essentially unchanged from prior exams. Dr. Bowles again recorded foot pain, fatigue, swelling, numbness in hands, with edema, Raynaud's, and possible Charcot-Marie-Tooth.

In August 2006, Cahill saw Waqar Waheed, M.D., for a neurological consultation. Cahill again complained of neck pain, numbness, fatigue, and swelling, as well as leg cramps with exertion, limited focus, and decreased grip strength. Dr. Waheed noted review Cahill's extensive work-up and history; Dr. Waheed performed a sensory examination that revealed decreased pin-prick sensation in the lateral aspect of the right thigh, which was thought to be suggestive of right meralgia paresthetica. Dr. Waheed

---

[7] Meralgia paresthetica is a condition caused by compression of a nerve characterized by tingling, numbness and burning pain in the outer thigh. Mayo Clinic staff, *Meralgia paresthetica*, http://www.mayoclinic.com/health/meralgia-paresthetica/DS00914, last visited on August 12, 2008.

9

found no edema. Dr. Waheed found mild flexion abnormalities in Cahill's hands and normal strength. Dr. Waheed then opined that Cahill's history and muscle biopsy were suggestive of metabolic myopathy, possibly glycogen storage disease, but that previous tests were inadequate to clearly test for the exact enzyme defect. Furthermore, Dr. Waheed stated that even if an exact diagnosis were confirmed, there is no definite treatment for glycogen storage disease, and that treatment is predominantly symptomatic. Dr. Waheed's report bears only the doctor's typewritten name, without signature. A subsequent CT scan did not explain Cahill's symptoms.

Cahill returned to Dr. Waheed in October 2006. An EMG/nerve conduction study showed carpal tunnel syndrome with mild chronic denervation changes. While the study showed no evidence of myotonia, Dr. Waheed noted slightly-positive anti-potassium channel antibodies, consistent with myotonias and muscle stiffness. Dr. Waheed recommended intravenous immunoglobulin ("IVIG") treatment.[8]

Throughout this medical history, Cahill was prescribed and took several medications. These included medications for pain, inflammation, swelling, and at least one anti-depressant.

In November 2006, Dr. Bowles completed a Medical Source Statement - Physical

_____

[8]     IVIG treatment is a blood product which is administered intravenously. It has been used to treat inflammatory, neurological, and muscle diseases. Treatment is rather expensive, running up to $10,000 per treatment. *See* Wikipedia contributors, *Intravenous Immunoglobulin*, WIKIPEDIA, THE FREE ENCYCLOPEDIA, http://en.wikipedia.org/w/index.php? title **=Intravenous _immunoglobulin&oldid=224541220 (last visited August 15, 2008).**

10

("MSS") regarding Cahill; the form is a checkbox form, similar to that completed by Dr. Mauldin. Dr. Bowles opined that Cahill: could lift and/or carry less than five pounds; could stand and/or walk less than one hour throughout an eight-hour workday; could sit less than fifteen minutes without a break and less than one hour in an eight-hour workday; was completely unable to push/pull; and could never climb, balance, stoop, kneel, crouch, crawl, reach and handle; and should avoid any exposure to extreme temperatures, weather, humidity, dust/fumes, vibration, hazards and heights. Dr. Bowles opined that Cahill would need to lie down or recline to alleviate symptoms for fifteen to thirty minutes hourly during an eight-hour workday. Dr. Bowles noted that Cahill's pain and medication cause very limited attention span, of less than two minutes.

Also in November 2006, Dr. Waheed completed an MSS regarding Cahill. Dr. Waheed opined that Cahill: could lift and/or carry less than five pounds; could stand and/or walk fifteen minutes without a break and less than one hour throughout an eight-hour workday; could sit less than thirty minutes without a break and less than one hour throughout an eight-hour workday; was completely unable to push/pull with his right hand and limited in that ability with his left hand; could never climb, stoop, crouch, or finger with his right hand; could occasionally balance, kneel, crawl, reach with his left hand, handle with his left hand, finger with his left hand, and feel; should avoid any exposure to vibration, hazards or heights and moderate exposure to extreme temperatures, humidity, and dust/fumes. Dr. Waheed opined that Cahill would need to lie down to alleviate symptoms for six hours during an eight-hour work day. Dr. Waheed noted that

11

Cahill's pain and medication caused severe drowsiness at times and constant mild drowsiness. Dr. Waheed's MSS appears to bear a stamped signature.

### A.    Cahill's Testimony

On January 4, 2007, Cahill testified before the ALJ. Cahill stated that he still experienced difficulty raising his arms over his head. In addition, Cahill testified that he experienced pain in, and difficulty with, his hands that made it hard to even open a car door, grip and open a can, or hold a screwdriver. He stated that he experienced constant pain in his neck and back that make it difficult to turn his head. He said that, as a result of his back and neck pain, he could not sit for a long period of time without having to stand up and stretch or his feet would swell and go numb; he also testified he could not stand or walk for more than an hour or his feet would swell. Furthermore, Cahill stated that as a result of his glycogen storage disorder and medications he was constantly fatigued and tired and had to lay down two or three times a day to help relieve his symptoms. Moreover, Cahill stated that the combination of his impairments left him with difficulty with focusing and concentrating on tasks he tried to accomplish; he thought he functioned at only thirty percent of the level at which he functioned before the accidents.

Cahill said that he stopped working as a result of the automobile accidents in 2002 and 2003. Cahill testified that, for a time after the accidents, he had an agreement with his boss under which Cahill worked off and on to the extent he was able. Eventually his medical problems – limitations in raising his hands over his head to climb scaffolding, pain in his hands, and swelling in his feet – became too great and he stopped working

altogether in August 2004.  While Cahill had filed lawsuits with regard to the accidents, he testified that they had both been settled.

###    B.    The Vocational Expert's Testimony

The ALJ heard testimony from a vocational expert ("VE").  The ALJ asked the VE to assume a claimant of Cahill's age, education and experience with the following parameters:  ability to perform no more than light work as defined by the regulations; ability to lift up to twenty pounds occasionally and ten pounds frequently; ability to stand/walk six hours in an eight-hour workday and sit six-to-eight hours in that workday; ability to bend, stoop, crawl, crouch, and kneel occasionally; ability to follow simple to detailed, but not complex instructions; need to avoid climbing of significant unprotected heights, potentially dangerous machinery, commercial driving, extreme temperatures and humidity, uneven surfaces, vibration, public contact, and skilled work.  The VE testified that, within these parameters, the claimant could perform work including cleaner/housekeeping or assembler.

The ALJ then asked the VE to consider four separate additional limitations.  First was a claimant who was unable to sustain eight hours of sitting, standing or walking at any exertional level.  Second was a claimant who would need to elevate his legs at least two times a day at random for at least twenty minutes to relieve swelling.  Third was a claimant who had a very weak grip in a dominant right hand, who could only occasionally reach, handle, finger or feel.  Fourth was a claimant who would be severely drowsy at times and constantly mildly drowsy (such that they could not concentrate two hours at a

13

time).  As to each of the four additional limitations individually, the VE testified that such

an individual would not be able to find competitive work.

## II.     The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

The claimant must show he is not engaging in substantial gainful activity and that
he has a severe impairment. Those are steps one and two.  Consideration must then
be given, at step three, to whether the claimant meets or equals [an impairment
listed in the regulations]. Step four concerns whether the claimant can perform his
past relevant work; if not, at step five, the ALJ determines whether jobs the
claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§

404.1520, 416.920).

After describing this process, the ALJ found that Cahill was not disabled.  At step

one, she determined that Cahill was not engaging in substantial gainful activity.

At step two, the ALJ determined he was severely impaired by (1) "mild to

moderate osteoarthritis with osteophytes . . . with evidence of mild nerve root

compression at C3-4"; (2) right carpal tunnel syndrome; and (3) probable glycogen

storage disease.

The ALJ found several other alleged impairments to be non-severe.  First was

anxiety and depression; the ALJ found Dr. Bowles' report of limited attention

contradicted by other reports of alertness, orientation, normal judgment and memory.  The

ALJ found that Cahill's sleep apnea had been successfully treated and he had been

released from care.  The ALJ found no basis for obesity as a severe impairment, as Cahill

14

showed only minor weight gains. The ALJ also found that Cahill's cellulitis had resolved after approximately thirty days of treatment.

At step three, the ALJ determined that Cahill did not have a listed impairment or combination of impairments. She noted that treating physicians and other medical professionals have reported that Cahill has undiminished strength, moves about easily, and is able to ambulate without assistance.

At step four, the ALJ found that Cahill was unable to return to his pas relevant work. However, the ALJ determined that he had the residual functional capacity (RFC) to perform jobs where he would:

- sit six to eight hours in an eight-hour workday;

- stand and/or walk six hours in an eight-hour workday;

- lift and carry twenty pounds occasionally and ten pounds frequently;

- occasionally bend, stoop, crawl, crouch, and kneel;

- carry out at least simple to detailed, if not complex, instructions;

- *not*, due to cervical problems and decreased mobility, perform commercial driving, climb or be exposed to significant unprotected heights, or be exposed to potentially dangerous unguarded moving machinery;

- *avoid*, to prevent exacerbation of symptoms, exposure to extremes of cold and humidity, uneven work surfaces, and extreme vibration; and

- *not* perform customer service and should only have incidental contact with the public.

In making this RFC finding, the ALJ noted Cahill's testimony of swelling, grip issues, fatigue, inability to carry heavy objects and walk for prolonged periods.

15

While stating that Cahill's medically determinable impairments could cause these symptoms, the ALJ found that Cahill's statements concerning intensity, persistence and limiting effects of those symptoms were not entirely credible. The ALJ said the clinical and objective findings were inconsistent with Cahill's claim of total disability, as they do not show a significant degree of muscle atrophy, muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion. The ALJ stated that Cahill's hypersomnolence and swelling have been reported by history, but were not linked to medically determinable impairments; the ALJ found that both issues had resolved themselves with treatment.

In discounting Cahill's complaints, the ALJ also noted other evidence of record. She commented on his good work record. However, she found he had motivation to exaggerate his complaints to further his lawsuits; she noted that he sought treatment from a chiropractor for several months and went to a neurologist at the suggestion of his attorney. The ALJ stated that Cahill cancelled physical therapy appointments and did not return for further treatment. The ALJ noted that Cahill had been referred to a pain clinic, but that the pain specialist determined that Cahill did not need a pain clinic based on examination. The ALJ considered that Cahill had cancelled one chiropractic appointment to go deer hunting, finding that this plus the lack of evidence of muscle atrophy or weakness demonstrated that Cahill was more active than he alleged.

The ALJ also commented on the medical opinions of record. The ALJ highlighted the "great weight" given to the Disability Determinations Service reviewing physician's

opinion, which the ALJ found consistent with other objective medical evidence, including the work up done by Dr. Lopate and his colleagues at Barnes Jewish Hospital.

The ALJ rejected the MSS opinions of the physicians who treated Cahill.. The ALJ noted that Dr. Bowles' opinion "appears to be largely based" on Cahill's subjective complaints. The ALJ determined that Dr. Bowles' diagnoses of ASD and Raynaud's were "not supported by the weight of the medical evidence." The ALJ stated that Dr. Bowles' diagnoses were "not confirmed" by Dr. Waheed. Therefore, the ALJ gave Dr. Bowles' opinion little weight.

Having stated that Dr. Waheed's treatment did not confirm Dr. Bowles' opinion, the ALJ then dismissed Dr. Waheed's MSS opinion entirely. The ALJ's decision reads: "[Cahill] has submitted a check-box form bearing a rubber stamp facsimile of Dr. Waheed's signature. . . . This document has no value as evidence, as its provenance cannot be ascertained, and it is given no weight in this decision." ®. at 23.)

At the fifth step, the ALJ heard the testimony of the VE. The VE considered the RFC as determined by the ALJ. Based on this, the VE testified that Cahill could work as a cleaner/housekeeper or assembler, and that such jobs exist in significant numbers in the state and national economies. Therefore, the ALJ found that Cahill was not disabled.

## III.    Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir.2007). "Substantial evidence is evidence that a

17

reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. March 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at * 1 (8th Cir. Oct. 4, 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id*. (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is true even where a claimant is represented by counsel. *Id.*

## IV. Discussion

Cahill argues that the ALJ's decision is not supported by substantial evidence. Specifically, Cahill contends that the ALJ failed to properly consider the opinions of Dr. Bowles and Dr. Waheed and, thus, failed to properly assess RFC. The Court agrees.

### A. Treating Physicians' Opinions

The Eighth Circuit has explained the framework under which ALJs should consider the opinions of physicians:

The regulations provide that unless the ALJ gives a treating source's opinion

18

controlling weight the ALJ considers all of the following factors in deciding the weight to give to any medical opinion: (1) examining relationship, (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) any factors the applicant or others brings to the ALJ's attention. The regulations provide that if the ALJ finds that a treating source's opinion on the issue(s) of the nature and severity of the applicant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the applicant's record, the ALJ will give it controlling weight.

*Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)) (internal quotations and punctuation omitted). ALJs may reject treating physicians' MSS opinions where those opinions stand alone, are never mentioned in the physicians' treatment records, and are not supported by objective testing or reasoning. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (citation omitted).

### 1. Dr. Bowles

The ALJ dismissed Dr. Bowles' opinion. The ALJ commented that Dr. Bowles' opinion was based on Cahill's subjective complaints, "not supported by the weight of the medical evidence," and "not confirmed" by Dr. Waheed.

Dr. Bowles was Cahill's primary care physician, and examined Cahill on no less than ten occasions. Dr. Bowles repeatedly observed swelling and diagnosed Cahill with Raynaud's disease, possible Charcot-Marie-Tooth disorder, and anxiety. Dr. Bowles repeatedly noted Cahill's reports of pain, numbness, and fatigue. Dr. Bowles referred Cahill to Dr. Waheed, a neurologist.

Dr. Bowles' MSS sets out significant limitations for Cahill, as set forth above. Those limitations are consistent with his treatment notes and diagnoses.

19

Dr. Bowles' opinion did not stand alone, as it is consistent with other record evidence. The ALJ dismissed Dr. Bowles' MSS report of "very limited attention span" because Dr. Bowles did not mention this in his treatment notes. However, Dr. Lopate (whose opinion the ALJ found consistent with Dr. Mauldin's) noted that Cahill seemed to be agitated and would lose focus during conversation. Dr. Lopate further noted that Cahill consistently complained of pain, and concluded that, though his presentation was not typical, he may have glycogen storage disorder. Dr. Lopate's records show decreased pin prick sensation, as well as complaints of pain and numbness, along with an abnormal muscle biopsy. Dr. Pasricha's November 2004 letter states that Cahill had symptoms of myopathy, which the letter describes as a debilitating disease of the muscular tissue that causes muscle weakness, spasms, and pain; the letter states that Cahill would likely experience these symptoms for at least the next three years.

Under the framework provided by the regulations, Dr. Bowles' opinion was entitled to controlling weight. Dr. Bowles examined Cahill several times. Dr. Bowles treated Cahill as a primary care physician. Dr. Bowles consistently rendered the same diagnosis. Dr. Bowles' opinion is supported by other record evidence and laboratory testing. It is not inconsistent with other substantial record evidence. The ALJ failed to properly weigh Dr. Bowles' opinion.

### 2. Dr. Waheed

Furthermore, the ALJ refused to consider the opinion of Dr. Waheed, a neurologist. Dr. Waheed examined Cahill and considered his laboratory test results. Dr.

20

Waheed found evidence of myotonia and recommended IVIG treatment. Dr. Waheed issued an MSS, also setting out significant limitations for Cahill, as set forth above. Those limitations are consistent with his own treatment notes and diagnoses, as well as other record evidence.

With regard to Dr. Waheed's opinion, the ALJ's decision reads:

[Cahill] has submitted a check-box form bearing a rubber stamp facsimile of Dr. Waheed's signature. . . . This document has no value as evidence, as its provenance cannot be ascertained, and it is given no weight in this decision.

®. at 23.) The ALJ's decision is inconsistent itself in this regard: having relied on Dr. Waheed's unsigned treatment notes to dismiss Dr. Bowles' opinion, the ALJ dismissed Dr. Waheed's MSS on the sole basis that it bore a stamped signature.

The ALJ's dismissal of Dr. Waheed's opinion was inconsistent with the applicable regulations. While the regulations provide that stamped signatures are not appropriate for consulting physician's reports, there appears to be no correlating regulation for treating physicians' reports. *See* 20 C.F.R. § 404.1519n(e) (discussing obligations of *consultative* medical sources: "A rubber stamp signature of a medical source . . . is not acceptable").

Moreover, if the ALJ felt the need to clarify that the opinion was, indeed, that of Dr. Waheed, she should have attempted to contact him. *See* 20 C.F.R. § 404.1512(e) ("When the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled . . . [w]e will first recontact your treating physician . .

Case 6:07-cv-03432-NKL   Document 9   Filed 08/25/08   Page 21 of 25

. ."].  The ALJ failed to consider Dr. Waheed's opinion as required by the regulations.[9]

Having failed to consider the opinions of two of Cahill's main treating physicians, the ALJ determined that other medical evidence did not support his claim for benefits. This is not a case in which Cahill received only minimal medical intervention and took pain medication on an occasional basis.  Instead, the record demonstrates "repeated and consistent visits to doctors."  *See Sing. v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).  At the time of the hearing, Cahill was taking, and had taken numerous prescription medications prescribed by physicians.  *See id.*  He had "availed himself of many pain treatment modalities including chiropractic treatments . . . and many diagnostic tests."  *See id.* (finding that ALJ improperly dismissed treating physician's opinion).  The ALJ should have paid particular attention to the opinions of Cahill's treaters under these circumstances.

### B.    Residual Functioning Capacity

After dismissing the opinions of Dr. Bowles and Dr. Waheed, the ALJ turned to the RFC determination.  The ALJ determined that Cahill was not capable of performing his past relevant work.  The burden then shifted to the Commissioner to prove that Cahill retained the RFC to do other kinds of work, and that such work existed in substantial

---

[9]    Although ALJs need not recontact physicians where there is otherwise enough evidence on which to base a determination, *Hacker v. Barnhart*, 459 F.3d 934 (8th Cir. 2006), here there was not such evidence.  Having improperly rejected Dr. Bowles' MSS, the ALJ was under a particular duty to recontact Dr. Waheed:  his MSS was the only other medical evidence addressing RFC, discussed in more detail below.

22

numbers in the national economy.  *See Nevland v. Apfel*, 204 F.3d 853, 857-58 (8th Cir. 2000).

At this fifth step of disability analysis, "some medical evidence" must support the ALJ's RFC findings. *Id.*  The ALJ did generally refer to medical evidence beyond that offered by Doctors Bowles, Waheed and Mauldin:  the ALJ's decision states that the objective medical findings are devoid of evidence of significant muscle atrophy, spasm, sensory or motor loss, gait disturbance, or reduced range of motion.   However, the ALJ's decision is devoid of any discussion on how this medical evidence supported her conclusions regarding Cahill's limitations.

Here, the ALJ gave "great weight" to the checkbox, non-treating, non-examining opinion of Dr. Mauldin. However, an ALJ may not rely solely upon the opinion of a non-treating, non-examining physician who reviewed the reports of treating physicians to form an RFC determination.  *Id.* at 858.

The opinions of Dr. Bowles and Dr. Waheed were the only opinions of treating physicians concerning Cahill's RFC.  As discussed above, the ALJ improperly dismissed those opinions.

Indeed, the ALJ's RFC determination appears to rely almost entirely upon Dr. Mauldin's report.  Especially in light of the ALJ's failure to properly consider the opinions of Dr. Bowles and Dr. Waheed, such reliance was misplaced.  *See Leckenby*, 487 F.3d at 633 (rejecting ALJ's RFC determination based on one-time consultive examiners' opinions which contradicted three treating physician's opinions and claimant's consistent

23

complaints of limitation).

To the extent the ALJ's RFC determination was not based on Dr. Mauldin's report, it appears to be based on the ALJ's own medical findings.[10] However, an ALJ may not substitute her own analysis of medical records for those of treating physicians. *Nevland*, 204 F.3d at 858 (citation omitted); *Pratt v. Sullivan*, 956 F.2d 830, (8th Cir. 1992) (reversing disability finding where ALJ substituted his own judgment concerning impairment for the express diagnosis of examining medical practitioners).

The ALJ discussed no proper medical evidence supporting her RFC determination. The ALJ's reliance on her own judgment and the reviewing physician's opinion does not satisfy her duty to fully and fairly develop the record. *See Nevland*, 204 F.3d at 858.[11]

## V.    Conclusion

The ALJ did not properly consider the medical evidence and failed to fully develop the record as to RFC. Accordingly, it is hereby

---

[10]    For example, Dr. Mauldin's RFC assessment states that Cahill is limited in his ability to push/pull (Tr. at 241); this limitation does not factor into the ALJ's RFC determination. In addition, it is unclear why the ALJ's RFC determination includes limited exposure to the public.

[11]    The VE's testimony relied on the ALJ's unsupported RFC finding. "[T]he testimony of a vocational expert who responds to a hypothetical based on [a non-treating, non-examining physician's opinion] is not substantial evidence upon which to base a denial of benefits." *Nevland*, 204 F.3d at 858.

When the ALJ asked the VE to consider limitations set forth in Dr. Bowles' and Dr. Waheed's MSS opinions, the VE testified that there would be no jobs available to Cahill. Thus, it is quite possible that Cahill would have been found disabled upon consideration of the VE's testimony had the ALJ properly-considered the treating physicians' opinions.

24

ORDERED that Plaintiff Colin Cahill's Petition [Doc. # 3] is GRANTED. The

ALJ's decision is REVERSED and REMANDED for further proceedings consistent with

this Order.


                                    s/ NANETTE K. LAUGHREY
                                    NANETTE K. LAUGHREY
                                    United States District Judge


Dated: August 25, 2008
Jefferson City, Missouri